IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 121,685

STATE OF KANSAS,
*Appellee*,

v.

CARLOS ANTONIO GALLEGOS,
*Appellant*.


SYLLABUS BY THE COURT


1.

An appellate court reviews issues of alleged jury instruction error to determine if the instruction is both legally and factually appropriate.


2.

Voluntary manslaughter is a legally appropriate lesser offense instruction of first-degree murder.


3.

Voluntary manslaughter is factually appropriate when the evidence demonstrates an intentional killing and a legally sufficient provocation. Whether provocation is legally sufficient is based on an objective standard of whether it would deprive a reasonable person of self-control and cause that person to act out of passion rather than reason.

4.

Whether an otherwise unsupported and self-serving statement of intent compels a lesser included offense instruction depends on the extent to which the other evidence repudiates the statement.

5.

When the evidence does not support the finding of the requisite provocation, the trial court is not required to instruct the jury on voluntary manslaughter.

6.

A voluntary intoxication instruction is only warranted when there is evidence of intoxication to the extent of impairing the ability to form the requisite intent. The court will not make an inference of impairment solely based on evidence of consumption.

7.

Prosecutorial error is found when the complained-of acts fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional rights to a fair trial.

8.

While it can be error for the prosecutor to appeal to the sympathy of the jury, statements made during closing arguments that attempt to mitigate unfavorable characteristics of a victim are permissible.

9.

Issues which are not adequately briefed are deemed abandoned.

10.

Cumulative error does not apply where the defendant has not established any error.

Appeal from Wyandotte District Court; J. DEXTER BURDETTE, judge. Opinion filed April 23, 2021. Affirmed.

*Hope E. Faflick-Reynolds,* of Kansas Appellate Defender Office, argued the cause, and *Peter Maharry,* of the same office, was on the brief for appellant.

*Daniel G. Obermeier*, assistant district attorney, argued the cause, and *Mark A. Dupree Sr.,* district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

WILSON, J.: Carlos Antonio Gallegos challenges his conviction for first-degree premeditated murder in the killing of M.C. Finding no error, we affirm.

## FACTS

In July 2016, M.C. was staying with her boyfriend, Andr'a Jones, and his cousin, Lakieva Rowe, at the Oak Tree Inn in Kansas City, Kansas. On July 5, Jones and Rowe left together to go get some food. M.C. stayed behind in the hotel room because she had plans to meet with the defendant, Gallegos.

Jones and Rowe returned to the hotel and waited outside in their car. When Jones began to worry because M.C. stopped responding to his text messages, he and Rowe went to the hotel room to check on M.C. They found M.C. lying on the floor of the hotel room.

3

M.C. was not breathing, nor did she have a pulse. They had the front desk call 911. When authorities arrived at the scene, M.C. was declared dead. Her body had injuries consistent with ligature strangulation.

Surveillance footage from the hotel confirmed that Gallegos and his car were at the Oak Tree Inn at the time of M.C.'s murder. Gallegos was arrested on July 6.

During a police interview, Gallegos initially denied meeting with M.C. on the day of the murder but eventually confessed to killing her. He explained that a few days before, he had arranged to pay M.C. for sex, but when he arrived for the meeting, M.C. and a black man robbed him of $100.

On the day M.C. was killed, Gallegos again arranged to meet with her at the Oak Tree Inn. After having sex with her in exchange for $100, he told M.C. to call the man who had previously robbed him. He said he "was determined to have [the man] kill me or to kill him." M.C. refused to cooperate and began to scream, which angered Gallegos further. Gallegos removed a shoelace from one of his shoes and strangled M.C. with it. During the police interview, Gallegos said, "I did to her what I did because she robbed me. . . . And that's why the revenge. It's sweet."

The State charged Gallegos with first-degree premeditated murder. At the trial, a forensic pathologist testified for the State and estimated it would have taken two to five minutes of compression on M.C.'s neck before she died of strangulation. The State also presented video surveillance footage from the hotel that showed M.C., Jones, and Rowe leaving their hotel room together. A few minutes later, the footage showed M.C., along with Gallegos, returning to the room. Shortly thereafter, Gallegos exited the room alone.

Gallegos' testimony at trial was consistent with his police interview. He testified that he arranged for the July 5 meeting with M.C. through a website and that he planned to use M.C. to lure Jones back to the room. He claimed that "[his] intentions were to go and unarm [Jones] and break his hands so he would only have his mouth so then he could only ask for money, not take it from other people."

Gallegos stated that he arrived at the hotel, engaged in sex with M.C., then paid her. He then told her she needed to contact Jones, but M.C. refused. Gallegos became angry and told her, "[I]f you don't call him, the problem's gonna be with you." M.C. still refused and began yelling for help. Gallegos removed the lace out of one of his shoes and began to strangle M.C. with it.

When asked how long it took before he let go of the laces, Gallegos responded, "I wouldn't know what to say . . . . Maybe 50 seconds." When asked what he was feeling during that time, he said, "Like I said, I squeezed her. So automatically when you squeeze someone's neck like the man that was up here testifying and you cut off somebody's oxygen, they're just like struggling trying to get air." Gallegos said he then went into the bathroom and washed his face and hands. He said he did not think about her condition because he was in shock. He picked up his shoelace and left the hotel.

Gallegos also testified that he had been drinking on the day of the murder, which was not unusual for him as he usually drinks eight beers a day. He stated that he started drinking around 12 p.m. and that he had six beers before meeting with M.C.

At the jury instruction conference, Gallegos requested instructions on heat-of-passion voluntary manslaughter and voluntary intoxication. The district court denied Gallegos' request, finding that the evidence did not support a voluntary manslaughter

5

instruction because his interaction with M.C. was not sufficient provocation to "deprive a reasonable man of self-control or to cause him to act out of passion rather than reason." The district court also found that there was insufficient evidence that Gallegos was so intoxicated he could not form the requisite intent for first-degree murder.

The jury convicted Gallegos of first-degree premeditated murder. Gallegos timely appeals.

ANALYSIS

Gallegos argues four issues on appeal. First, he contends the district court erred by declining to give a jury instruction on voluntary manslaughter as a lesser included offense. Second, the district court erred in declining to give a voluntary intoxication instruction. Third, the State committed prosecutorial error in closing arguments. And finally, the cumulative errors of his trial deprived him of a fair trial. Finding no error, we affirm his conviction.

*The district court did not err in declining to give a voluntary manslaughter instruction.*

Gallegos first claims that the district court erred by declining to give a jury instruction on voluntary manslaughter as a lesser included offense of first-degree murder. Gallegos does not deny that he killed M.C., however, he contends that his trial testimony supported a finding that the killing was done either in the heat of passion or a sudden quarrel, thus warranting a voluntary manslaughter instruction as a lesser included offense.

The State responds that a voluntary manslaughter instruction would not have been appropriate because Gallegos' interaction with M.C. was not a legally sufficient

6

provocation from an objective standpoint. Because there is no evidence that reasonably justifies the giving of a voluntary manslaughter instruction, we agree with the State and find that the district court did not err when it declined to give this instruction.

*Standard of Review*

This court reviews the denial of a requested jury instruction under the following standard of review:

> "When analyzing jury instruction issues, we follow a three-step process: '(1) determining whether the appellate court can or should review the issue, i.e., whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, i.e., whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

"The 'first and third step are interrelated in that whether a party has preserved a jury instruction issue will affect [this court's] reversibility inquiry at the third step.'" *McLinn*, 307 Kan. at 317. When the issue is preserved for review, any error is reversible if "we determine that there is a 'reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.'" *State v. Uk*, 311 Kan. 393, 397, 461 P.3d 32 (2020) (citing *State v. Plummer*, 295 Kan. 156, 168, 283 P.3d 202 [2012]).

To assess whether there was error, we utilize an unlimited standard of review of the entire record—viewing the evidence in the light most favorable to the requesting party (here, the defendant)—to consider whether the instructions were both legally and factually appropriate. *State v. Keyes*, 312 Kan. 103, 107, 472 P.3d 78 (2020); *State v. Barlett*, 308 Kan. 78, 84, 418 P.3d 1253 (2018).

7

*Discussion*

At trial, Gallegos requested an instruction on voluntary manslaughter. This means he properly preserved the issue for review on appeal. On the merits, the instruction would have been legally appropriate because voluntary manslaughter is a lesser included offense of first-degree murder. *State v. Parker*, 311 Kan. 255, 264, 459 P.3d 793 (2020) (citing *State v. Gallegos*, 286 Kan. 869, 874, 190 P.3d 226 [2008]). Thus, the analysis next considers whether the instruction was factually appropriate.

Here, the evidence does not support Gallegos' claim. "Voluntary manslaughter is knowingly killing a human being committed:  (1) Upon a sudden quarrel or in the heat of passion; or (2) upon an unreasonable but honest belief that circumstances existed that justified use of deadly force . . . ." K.S.A. 2020 Supp. 21-5404(a). The core elements of voluntary manslaughter are an intentional killing and a legally sufficient provocation. *State v. Campbell*, 308 Kan. 763, 775, 423 P.3d 539 (2018) (citing *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 [2014]).

Whether provocation was legally sufficient is based on an objective standard. *State v. Gentry*, 310 Kan. 715, 723, 449 P.3d 429 (2019). To be legally sufficient, a provocation must deprive a reasonable person of self-control and cause that person to act out of passion rather than reason. *Hayes*, 299 Kan. at 866.

Gallegos contends that his trial testimony supported an instruction of voluntary manslaughter based on either heat of passion or sudden quarrel. While neither of these terms are statutorily defined, this court has defined heat of passion as "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action.'" *State v. Wade*, 295 Kan. 916, 925, 287 P.3d 237 (2012) (quoting *State v. Vasquez*, 287

8

Kan. 40, 54, 194 P.3d 563 [2008]). The other qualifier has been explained by defining each word. "'Sudden' means '[h]appening without warning; unforeseen[;] [c]haracterized by hastiness; abrupt; rash[;] [c]haracterized by rapidity; quick; swift.' And 'quarrel' means '[a]n altercation or angry dispute; an exchange of recriminations, taunts, threats, or accusations between two persons.' [Citation omitted.]" *Parker*, 311 Kan. at 265.

The district court denied Gallegos' requested instruction, finding that the alleged provocation was not adequate to cause a reasonable person to act without thinking:

"[M.C.] calling for help or saying no, no is certainly, in the Court's opinion, not sufficient provocation for an ordinary reasonable man to act the way [Gallegos] did. It's not of a nature that would deprive a reasonable man of self-control or to cause him to act out of passion rather than reason.

"Certainly there was a disagreement. I don't know necessarily that it was a quarrel or an argument, but the basic definition of what a quarrel is or an argument is, in this Court's opinion, differs from the fact situation that came to be in this case."

The court also found Gallegos' actions indicated Gallegos was in full control of his decision making. The court explained that when M.C. refused to call Jones, Gallegos' reaction seemed deliberate rather than impulsive:

"[Gallegos] didn't grab a lamp and strike her in the head. He didn't immediately beat her with his fists. He didn't immediately grab her by the throat with his hands and try to strangle her. He took the time to unlace his boots, twine them together, string that around [M.C.'s] throat and strangle her, which is not a quick and easy death. It requires a decision and a mindset that is determined and consistent and, in this Court's opinion, in control. After he finished, he didn't panic. He removed the shoelaces, he left, he didn't run, went to his car. The next day, he went back to work."

9

Now on appeal, Gallegos argues that the district court was required to instruct the jury on a lesser included offense if there was some evidence that would have reasonably justified it. He contends that his testimony that he "reacted without thinking" supports a finding that the killing was done in a heat of passion. Moreover, he contends that his testimony that he and M.C. got into an argument and that she "began screaming at him" supports a finding of a sudden quarrel.

Neither of Gallegos' contentions are persuasive. It is true that, in some circumstances, the unsupported testimony of the defendant alone may be sufficient to require a court to give a jury instruction on a lesser included offense. *State v. Haygood*, 308 Kan. 1387, 1408-09, 430 P.3d 11 (2018). However, "whether an otherwise unsupported and self-serving statement of intent compels a lesser included offense instruction depends on the extent to which the other evidence repudiates the statement." *State v. Seba*, 305 Kan. 185, 204, 380 P.3d 209 (2016). Here, Gallegos' testimony that would support a voluntary manslaughter instruction is inconsistent with the rest of the evidence.

First, Gallegos' claim that he reacted without thinking is subverted by his own testimony. Gallegos testified he wanted to get revenge for the robbery and that the purpose of meeting with M.C. was an attempt to get access to Jones. He testified that he planned to use M.C. to lure Jones back to the room. Gallegos explained that his intentions were to injure Jones in such a way that he would not be able to rob other people. Gallegos perpetuated this plan by attempting to make M.C. contact Jones after having sex with her. When M.C. refused to cooperate, Gallegos informed her that his problem would "be with [her]," indicating a thought-out update to his plan. Gallegos then took the time to put on his pants and shoes and unlace one of his shoes. He rolled up the shoelace and

strangled M.C. until she was dead. Gallegos then washed his hands and face, retrieved his shoelace, and left.

Nothing about Gallegos' behavior before, during, or after the murder suggests he was acting abruptly or in intense emotional excitement. On the contrary, Gallegos' conduct reveals a level of calculation that would negate any claim of completely spontaneous behavior. Gallegos' meeting with M.C. was not an unforeseen or abrupt encounter, rather it was methodically planned. Moreover, after M.C. refused to cooperate, Gallegos took the time to take the shoelace out of one of his shoes, roll it together, and put it around M.C.'s neck. According to the forensic pathologist, it would have taken several minutes for Gallegos to strangle M.C. to death with the shoelace. When taken as a whole, this scenario would nullify Gallegos' claim that he reacted without thinking.

Finally, Gallegos testified that after M.C. refused to call Jones back to the room, she began screaming at him and yelling for help. This contention is not enough. "Mere words or gestures, however offensive, do not constitute legally sufficient provocation for a finding of voluntary manslaughter." *Gentry*, 310 Kan. at 722; *State v. Bernhardt*, 304 Kan. 460, 475-76, 372 P.3d 1161 (2016); *Campbell*, 308 Kan. at 776 (victim yelling at defendant was not legally sufficient provocation); *State v. Woods*, 301 Kan. 852, 878, 348 P.3d 583 (2015) (verbal confrontation between defendant and victim not legally sufficient provocation). Certainly, a victim crying or yelling for help does not "rise[] to the objective legal threshold of sufficient provocation." *Uk*, 311 Kan. at 398. Even viewing the evidence in a light most favorable to Gallegos, we cannot find a legally sufficient provocation based on M.C.'s screaming and yelling for help. See *State v. Northcutt*, 290 Kan. 224, 234, 224 P.3d 564 (2010) ("Because there is no evidence of provocation . . . , much less severe provocation, the trial court was not required to instruct the jury on voluntary manslaughter.").

11

The pre-arranged meeting with M.C. was methodically planned by Gallegos as a means of enacting revenge on Jones. Further, the killing of M.C.—strangulation that lasted several minutes—revealed a certain level of calculation. Therefore, we hold that the district court did not err when it declined to give a voluntary manslaughter instruction.

*The district court did not err in declining to give a voluntary intoxication jury instruction.*

Gallegos contends that that the district court erred when it declined to give a voluntary intoxication jury instruction. He argues that his trial testimony supported a finding that he was intoxicated after drinking approximately six beers during a period of time before he met with M.C. On the other hand, the State claims that the district court did not err because Gallegos did not present any evidence of impairment that would warrant a voluntary intoxication instruction. Because Gallegos has only presented evidence of his *consumption* of alcohol and has failed to present evidence of *impairment*, we find that the district court did not err when it declined to give a voluntary intoxication jury instruction.

*Standard of Review*

This issue also involves Gallegos' challenge to a jury instruction, so this court follows the same three-step framework set forth above. See *McLinn*, 307 Kan. at 317.

*Discussion*

Gallegos requested an instruction on voluntary intoxication, so he has preserved this issue for review. On the merits, this instruction would have been legally appropriate

because voluntary intoxication may negate the intent element of a specific intent crime, and first-degree premeditated murder is a specific intent crime. *State v. Hilt*, 299 Kan. 176, 192-93, 322 P.3d 367 (2014); *State v. Dominguez,* 299 Kan. 567, 591-92, 328 P.3d 1094 (2014).

However, while it may have been legally appropriate, a voluntary intoxication instruction would not have been factually appropriate. Evidence of mere consumption of intoxicants does not necessitate a voluntary intoxication instruction. *State v. Davis*, 306 Kan. 400, 414-15, 394 P.3d 817 (2017). The relevant statute provides:

> "An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind." K.S.A. 2020 Supp. 21-5205(b).

We have consistently interpreted the statute to require the evidence to show proof of impairment. *State v. Brown*, 258 Kan. 374, 386-87, 904 P.2d 985 (1995). There must be "intoxication to the extent of impairing the ability to form the requisite intent." *State v. Betancourt*, 299 Kan. 131, 141, 322 P.3d 353 (2014). Such evidence may include loss of the ability to reason, to plan, to recall, or to exercise motor skills. *Betancourt*, 299 Kan. at 141-42.

"[E]vidence that a defendant has consumed alcohol or drugs, or that a defendant is 'high' or 'intoxicated,' does not permit an inference that the defendant was so impaired that he or she was unable to form the requisite intent." *State v. Kidd*, 293 Kan. 591, 595, 265 P.3d 1165 (2011) (citing *State v. Hernandez*, 292 Kan. 598, 607, 257 P.3d 767 [2011]); see also *State v. Brown*, 291 Kan. 646, 656-57, 244 P.3d 267 (2011) (evidence

13

that on the evening of the crime the defendant consumed alcohol, acted strange, and was intoxicated was insufficient to show defendant was so intoxicated he was unable to form the requisite intent). "A defendant's ability to recall the circumstances surrounding the charged crime and provide a coherent narrative of his or her conduct undercuts a claim of intoxication sufficient to warrant a jury instruction." *Davis*, 306 Kan. at 414-15 (citing *Hernandez*, 292 Kan. at 606-07).

This court will not make an inference of impairment solely based on evidence of consumption. At trial, Gallegos testified that he started drinking around 12 p.m. on the day of the murder and that he had six beers before meeting with M.C. around 5 p.m. The district court summarized Gallegos' testimony:

> "Regardless of the amount of beer [Gallegos] had consumed between apparently noon and the 5:00 o'clock, estimate of [M.C.'s] demise, that's the only alcohol that was testified to and he was able to work. He was able to go to the gas station. He was able to use his telephone and communicate with the victim in this case and arrange a meeting. He was able to go to that meeting, park his car, walk in. He was able to apparently pay for sex, engage in sex, and once he finished those actions, he again was of such a mind that he was able to act upon what he'd been thinking about for approximately three days and that was revenge, which has been a consistent theme in his actions."

The court's summary of the evidence does not support a finding that Gallegos was so intoxicated he was unable to form the requisite intent. As the district court correctly noted, the purpose of the meeting with M.C. was to persuade M.C. to lure Jones back to the room. After consuming six beers, Gallegos was able to drive to the Oak Tree Inn to meet M.C., have sex, pay for it, and then take steps to complete that very plan.

Subsequently, Gallegos was of the state of mind to recall the purpose of the meeting and instruct M.C. that he needed to get in contact with Jones. Therefore, Gallegos was clearly in the state of mind to plan and perform several tasks, thus demonstrating he was not so impaired that he could not form the intent to kill M.C. Additionally, his ability to recall the events of the day and provide a coherent narrative of these events undermines any evidence of impairment.

We hold that the district court did not err when it declined to give a voluntary intoxication jury instruction.

*The State did not commit prosecutorial error during closing arguments.*

Next, Gallegos claims that the State committed prosecutorial error in its closing argument. He contends that the prosecutor used an argument that sought a conviction based on sympathy for the victim, thus depriving Gallegos of a fair trial. The State counters by arguing that the prosecutor was merely asking the jury to set aside any prejudice against M.C. because she was engaged in prostitution, and that if there was any error, it was harmless. Because the prosecutor's comments in closing arguments appear designed to redress possible prejudice towards M.C. and not to divert the jury from its role in determining the guilt of Gallegos based on the evidence, we find that there was no prosecutorial error in closing arguments.

*Standard of Review*

Prosecutorial error is found when the complained-of acts fall outside the "wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair

trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). If an error is found, the next step is to determine whether it prejudiced the defendant's due process rights to a fair trial. *Sherman*, 305 Kan. at 109. In doing so, the court will use the constitutional harmlessness inquiry set forth in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). Ultimately, prosecutorial error is harmless if the State proves beyond a reasonable doubt that the error did not affect the trial's outcome in light of the entire record. *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 (2017).

In determining whether a prosecutor's statement "falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation." *State v. Ross*, 310 Kan. 216, 221, 445 P.3d 726 (2019). This is a fact-specific determination, and the outcome will depend on the particulars of the case. *State v. Thomas*, 311 Kan. 905, 911, 468 P.3d 323 (2020).

*Discussion*

Gallegos challenges two separate comments made by the prosecutor in closing. First, he argues that the prosecutor improperly appealed to the sympathies of the jury during the following portion:

> "Ladies and gentlemen, you may not agree with the way [M.C.] was living her life. She was prostituting herself. There's no question about that. But no one, no one, no human being deserves to die the way she died, struggling for breath, being conscious of what happened to her, trying to remove shoelaces from her neck so forcefully that she was gauging [*sic*] herself and you've seen that from the pictures. Left to die in a motel room off of Southwest Boulevard. Nobody deserves to die like that regardless of what they do."

16

Second, he argues that the prosecutor committed error during the rebuttal argument:

"[M.C.'s] life was worth more than $100. It was worth more than his pride. And as I just told you, State does not have to prove he woke up that morning intending to kill her. But all of the evidence in the case, most importantly her body and the way Dr. Mitchell could read her body with his expertise, shows this was done with premeditation."

Gallegos claims that these statements manipulated the jury by appealing for sympathy as to how M.C. died and diverted the jury from deciding the case based on the evidence, relying on *State v. Adams*, 292 Kan. 60, 253 P.3d 5 (2011), where this court ultimately found that statements urging the jury to focus on sympathy for the victim were error, albeit harmless. However, *Adams* is inapposite to the current situation because the prosecutor's statement here simply does not rise to the level of those in *Adams*. The prosecutor here certainly did not ask the jury to focus on sympathy for M.C. In fact, it appears the prosecutor was worried about the converse, as the State contends.

The State argues that the prosecutor's statements were appropriate and within the wide latitude afforded to prosecutors because the comments were meant to address Gallegos' motive of enacting his revenge against Jones and to mitigate the jury's prejudice towards M.C.'s prostitution. In the alternative, the State argues even if the statements were made in error, the error was harmless.

We have previously found a prosecutor's statements during closing argument that attempt to mitigate unfavorable characteristics of a victim to be permissible. In *State v. Pruitt*, the prosecutor stated, "Folks, [the victim] Phillip Little deserves your consideration, certainly. If you didn't approve of his lifestyle; if you didn't approve of his

17

spray-painting/graffiti work; if you didn't approve of the folks that they hung out with, that's really not the determination to make." 310 Kan. 952, 961, 453 P.3d 313 (2019). We found this statement did not constitute prosecutorial error because the prosecutor was merely acknowledging that the victim could have been viewed unfavorably, and that the prosecutor was merely asking the jury to ignore the personal characteristics of the victim and focus on the whether the defendant was guilty of the crime. *Pruitt*, 310 Kan. at 966. Such reasoning applies here. The prosecutor's statement that M.C. did not deserve to die the way she did was not an attempt by the prosecutor to divert the attention of the jury away from the evidence, but rather to mitigate potential unfavorable biases towards M.C. because she was prostituting herself.

The prosecutor's statement also does not appear intended to encourage the jury to consider emotions, passions, or prejudices in reaching its verdict. See *Thomas*, 311 Kan. at 910-11 ("[A] prosecutor's comments are improper if they encourage jurors to consider emotions, passions, or prejudices as a basis for their verdict, because emotions, passions, and prejudices are not facts."). On the contrary, the prosecutor appears to have been trying to discourage the jury from reaching a verdict based on prejudice against M.C.

Regarding the prosecutor's statement that M.C.'s life was worth more than $100, this court considered a similar statement in *State v. Stano*, 284 Kan. 126, 159 P.3d 931 (2007). There, the prosecutor, during closing arguments, stated:

> "To one person in this courtroom, the value of [the victim's] life was everything. To [the victim's wife], [he] was a friend, a companion, husband, father of their children, his life was worth everything. To another person in this courtroom, [the victim] was a smoker, a crack cocaine user, and to [the defendant], the value of [the victim's] life was the value of a rock of crack cocaine and the use of a car." *Stano*, 284 Kan. at 149.

18

The prosecutor finished closing arguments by stating that "'to [the victim's wife], [the victim] was everything. The time has come, we need to ask you to tell [the defendant] that she's right.'" *Stano*, 284 Kan. at 150.

The *Stano* court found that these statements by the prosecutor were outside the wide latitude granted to prosecutors because evidence of the impact of the crime on the victim was irrelevant. *Stano*, 284 Kan. at 150. Nevertheless, the court held that the statements were not reversible error because the two statements were only made in passing and there was strong evidence that supported the defendant's conviction. *Stano*, 248 Kan. at 150-51.

The prosecutor's statements here differ from the statements in *Stano*. The prosecutor in this case did not emphasize the value of M.C.'s life to her family members and did not encourage the jury to consider the impact of M.C.'s death on her family members. Nor did the prosecutor encourage the jury to send a message about the value of M.C.'s life. Rather, the prosecutor indicated that Gallegos was not justified in killing M.C. for robbing him. Much like the prosecutor's comments that M.C. did not deserve to die the way she did, the statement that M.C.'s life was worth more than $100 was discouraging the jury from considering M.C.'s personal behavior in reaching its verdict.

Looking at the prosecutor's comments in context, the prosecutor does not appear to have been appealing to the jury's sympathy. They did not ask the jurors to place themselves in M.C.'s position or the position of her family members. See *Thomas*, 311 Kan. at 910-11 (improper for prosecutor to encourage jurors to place themselves in position of a victim or a victim's family member). Nor did the prosecutor ask for justice for the victim. See *State v. Holt*, 300 Kan. 985, 998-99, 336 P.3d 312 (2014) (discussing

19

cases in which the prosecutor was found to have committed misconduct by asking for justice for victim).

Instead, the prosecutor appears to have been arguing that the jury should not reach a decision based on a prejudice against sex workers or robbers. Like the comments in *Pruitt*, these comments indicate the jury should ignore M.C.'s personal characteristics and focus on the evidence establishing Gallegos' guilt.

We therefore hold that the prosecutor's statements in closing argument did not amount to prosecutorial error.

*Gallegos' additional issues are waived.*

Gallegos includes two issues in his statement of issues that are not otherwise raised or argued in his brief: (1) that the district court violated his constitutional right to a jury trial by declining to give jury instructions on voluntary manslaughter or voluntary intoxication; and (2) that the district court violated his due process rights by failing to give a voluntary manslaughter jury instruction.

Gallegos raises these issues for the first time on appeal without explaining why this court should address them. Under this court's rules, a party briefing an issue on appeal must make a "reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court." Supreme Court Rule 6.02(a)(5) (2021 Kan. S. Ct. R. 36). A litigant who fails to comply with this rule risks having the issues considered waived and abandoned. See *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014).

20

This court has previously declined to address an issue on this ground. See, e.g., *State v. Johnson*, 293 Kan. 959, 964-65, 270 P.3d 1135 (2012).

Because these apparent issues are only included in Gallegos' statement of issues and are not adequately briefed, we deem them abandoned.

*Cumulative error did not deprive Gallegos of a fair trial.*

Finally, Gallegos argues cumulative error denied him a fair trial. The cumulative error rule does not apply if there are no errors or only a single error. *State v. Green*, 311 Kan. 960, 993, 469 P.3d 1228 (2020). As Gallegos has failed to establish any error, this rule is inapplicable.

Gallegos' conviction for first-degree murder is affirmed.