NOT DESIGNATED FOR PUBLICATION

No. 126,408

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

WILLIE D. POWELL JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Geary District Court; COURTNEY D. BOEHM, judge. Submitted without oral argument. Opinion filed June 21, 2024. Affirmed.

*Sam Schirer,* of Kansas Appellate Defender Office, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before BRUNS, P.J., HILL, J., and MARY E. CHRISTOPHER, S.J.

PER CURIAM:  This is the direct appeal of Willie Deonta Powell Jr. of his conviction for intentional murder in the second degree. Powell claims several prosecutor errors, instruction errors, and cumulative errors. We affirm.

*A barbershop brawl ends in death.*

Three friends—Powell, Jaron Zanders, and LaVincent Perdue Jr.—all went in Zander's car to a barbershop to get haircuts. All three carried firearms, but they left their guns in Zanders' car before entering the shop. Because the shop was busy, Perdue stayed

behind to wait for his haircut while the other two ran errands. Powell learned that he was next in line following his brother, who had arrived at the shop separately. Because Powell and Zanders were at separate stores, Powell insisted on driving the car back to the shop alone, but Zanders wanted Powell to wait. Powell told Zanders that Perdue would pick him up once Powell got to the shop and that Zanders had no other options.

After Perdue picked up Zanders, the two returned to the shop and saw that Powell had yet to have his hair cut. It is unclear in the record why, but Perdue became upset with Powell. Perdue began yelling and berating Powell and—after some bickering—the two went outside the barbershop to settle the dispute. Once outside, Perdue hit Powell and knocked Powell's phone out of his hand. Before their dispute could escalate, Zanders broke up the fight. Neither Powell nor Perdue was injured, although Powell's shirt was torn. Perdue returned inside the shop, but Powell never went back inside the shop.

There are two versions of what happened next.

*The State's witnesses testify that Powell retrieved a gun from Zanders' car before reengaging with Perdue.*

There is some dispute over what Powell did before the final confrontation between the two men that later occurred. Several witnesses testified that Powell went to Zanders' car and retrieved his gun. The barber, Lytwon Oscar, known by patrons of the shop as "OG," testified that he saw Powell pacing back and forth in the parking lot. Oscar saw Powell walk towards the car and return without a shirt and carrying a gun.

Celena Gaytan, whose house shared a parking lot with the barbershop, testified that as she returned from work, she saw men outside the barbershop engaged in an argument. Gaytan testified that she saw one of the men go to his car before she heard gunshots. Shortly after, she saw a man without a shirt running from the scene.

Additionally, Jaron Zanders testified that as he got Perdue inside the shop, Powell went to the front passenger seat of Zanders' car. When Powell came back, Zanders saw Powell with a gun.

*Powell shoots Perdue.*

While Powell was pacing outside, Perdue came inside the shop and Oscar heard Perdue talking about the altercation. Perdue told Oscar, "OG, that's some weak stuff, man. The man called me outside thinking he want to fight, now he want to—I come outside to fight, now he want to get a pistol." Seconds later, Oscar saw Powell reapproach the shop; he was carrying a gun. This was about five minutes after the initial altercation. All of Oscar's patrons largely respected his unspoken rule that no guns were allowed in the shop, so Oscar went outside to try to prevent Powell from bringing the gun inside.

Powell reassured Oscar that he would not take the gun inside, stating "OG, man, I'm not coming in your shop. I'm not going to come to your shop and do nothing, man, but the dude don't need to holler at me, you know what I'm saying, he got to come talk to me." But at the same time, the shop's front door swung open and hit the pillar, and Oscar heard Perdue's voice, exclaiming that "[He] ain't scared of no pistol" and "[He] ain't scared of no MF gun." Oscar saw what was going to happen next and ducked to get out of the way, shielding himself behind the hood of his truck in the parking lot.

Once he saw Perdue, Powell's eyes widened and his jaw clenched. Powell raised his gun, aimed it at Perdue, cocked it, and fired four or five times at Perdue in quick succession at close range. In the moments that followed, Powell froze and stared down in disbelief at the body of his former friend. Seconds later, Powell fled on foot, hiding in a trash can before fleeing to Topeka. About 12 hours after shooting Perdue, Powell turned himself in to law enforcement.

Perdue, however, never did leave the barbershop. He died of multiple gunshot wounds to his heart and lungs—lying on the ground with his boots in the doorway and his body inside the shop.

*Powell gave parallel but varying facts, claiming he had his gun tucked in his waistband the whole time.*

Powell testified in his own defense, mainly claiming that he acted in self-defense. Powell testified that he was scared that Perdue would physically assault him because of their earlier fight. Powell's version of the fight deviated from the State's witnesses. In his version, the initial confrontation was more physical. Powell claimed that Perdue punched him twice and knocked him to the ground. Once Powell was on the ground, he testified that Perdue stood over him, calling him names and kicking him. It was then that Powell said that he brandished his gun—claiming it was with him the entire time—to deescalate the fight. Zanders then got between his two friends, pushing Perdue back inside the shop. Powell said that it was moments later when Oscar saw Powell's gun and went outside to keep him from bringing the gun into the shop.

While Oscar tried to keep Powell from going inside with a gun, Perdue barged out of the front door. Powell recalled that Perdue continued to orally assault him with disparaging names and said that he was not "scared of no gun." Powell could not recall whether he saw a gun on Perdue. But despite not knowing, Powell feared what Perdue might do because Perdue had "just basically beat me up and already got the best of me. I didn't know exactly what he was coming to do at this point, what more are you coming to do, so I was very scared." Because of the size difference between the two men—Perdue was 6 ft., 3 in. and 256 lbs. and Powell was 5 ft., 6 in. and 185 lbs.—Powell did not believe he could physically protect himself from Perdue. So, Powell said, "I defended myself . . . [w]ith my firearm."

On cross-examination, however, Powell testified that he was not scared that Perdue would shoot him. He said that he was not angry but said he was calm, cool, and collected when he pulled his gun out. Powell also admitted that he never intended to use the gun but that he "was only trying to scare [Perdue.]" Powell used the gun as a show of force.

*Powell is convicted and appeals.*

The jury found Powell guilty as charged of intentional murder in the second degree. The court later imposed a 155-month prison sentence. Powell raises prosecutor error and jury instruction error in this appeal. He also claims cumulative error as well.

*Are there prosecutorial errors revealed in this record?*

Powell claims that prosecutorial errors deprived him of a fair trial. The claims stem from two lines of questions by the prosecutor during Powell's cross-examination. He argues that these errors resulted from a brazen circumvention of hearsay evidence rules, resulting in a devastating and pervasive effect on the jury's assessment of Powell's self-defense claim and that only reversal could remedy this deprivation of his fair trial.

In Powell's view, the prosecutor's questions improperly vouched for the State's theory that Powell retrieved a gun from Zanders' car. The phrasing of the questions implied that an unavailable witness heard Powell contradict the testimony he gave at trial. These challenged questions related to Powell's statements made to an unavailable witnesses. Both questions were objected to and sustained as hearsay.

Powell argues that the prosecutor's mere mention of the existence of inadmissible hearsay deprived him of his right to a fair trial because the jury could not unhear the statements.

*Prosecutorial error issues receive a two-part analysis on appeal.*

Claims of prosecutorial error receive a two-part analysis. First, the reviewing court must determine whether a prosecutor's comments fall "outside the wide latitude afforded to prosecutors to conduct the State's case in a way that does not offend the defendant's constitutional right to a fair trial." *State v. Chandler*, 307 Kan. 657, Syl. ¶ 6, 414 P.3d 713 (2018). Then, if the comments fall outside the permissible scope, the court must evaluate whether those comments prejudiced the defendant's right to a fair trial. *Chandler*, 307 Kan. at 679.

Guiding a prosecutorial error analysis is the constitutional harmlessness inquiry announced by the United States Supreme Court in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). Using that lens, the reviewing court will reverse instances of prosecutorial error unless the State proves "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *Sherman*, 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

*Powell claims the questions implied the existence of inadmissible hearsay prejudicing his self-defense theory at trial.*

Powell hinges his argument on his theory of defense at trial—that he acted in self-defense when he shot Perdue. He argues that his testimony disputed the State's theory at trial that he retrieved a gun from Zanders' car before the final confrontation. In his view, this dispute between the State's witnesses' testimony and Powell's testimony was significant because a finding that Powell sought out a gun prior to his final confrontation with Perdue would support a legal conclusion that Powell, as an aggressor, would not be entitled to claim self-defense. So, Powell argues the prosecutor's mention of hearsay

6

statements elicited from unavailable witnesses that would claim otherwise prejudiced Powell's right to a fair trial.

We will examine both prosecutorial error claims.

*The first claim involved statements made by Powell to Zanders' mother.*

In his first claim of prosecutorial error, Powell argues that the prosecutor's questioning pertained to evidence that was inadmissible. Powell contends that the prosecutor lacked good faith to continue questioning Powell on statements the prosecutor knew were inadmissible and "brazenly circumvented hearsay evidence rules enacted to ensure fair trials."

The challenged questions follow:
"Q: You spoke to [Zanders' mother] after the shooting occurred, did you not?
"A: Not exactly. I spoke to my girlfriend.
"Q: And [Zanders'] mom was present, wasn't she?
"A: I'm not sure, I wasn't there to confirm that.
"Q: But you heard her talk to you, did you not.
"A: I guess, I'm not sure.
"Q: And, in fact, you told her during the conversation that you went to your car to retrieve a gun before you shot Mr. Perdue, did you not?
"A: No, ma'am. I don't recall.
"Q: *So if she wrote a statement to the contrary–*
    "[Defense counsel]: Objection, Your Honor, anything she says would be hearsay if she's not going to come here to testify.
    "THE COURT: Is she going to testify?
    "[Prosecutor]: No, Your Honor.
    "THE COURT: It's hearsay, the objection's sustained." (Emphasis added.)

The prosecutor tried to impeach Powell's testimony with a statement he made while talking to his girlfriend on the phone. The State concedes the question by the prosecutor was likely error and the objection was properly sustained. We agree. Because the witness who wrote the statement referred to by the prosecutor was not going to testify, the contents of that statement would be inadmissible hearsay. Thus, the question by the prosecutor concerning an unavailable witness' statement was erroneous.

*The second claim of prosecutorial error concerned a phone call between Powell and his brother*.

The next line of questioning involved statements made by Powell to his brother after the killing but before Powell had turned himself in to law enforcement. The statements were immediately objected to and sustained before Powell could answer. The exchange follows:

"Q: And so after the shooting occurred and you fled from the scene, you make a phone call to your brother; correct?

"A: Several.

"Q: Okay. And in one of those calls *you tell your brother, I got the gun out of the car and when he charged at me again, I shot him*.

"[Defense counsel]: Objection, Your Honor, that is not his statement. If it's the statement of somebody else who's not going to be called here to testify because the State won't bring them in, then they can't try to introduce their statements when we don't get a chance to cross-examine.

"THE COURT: Whose statement is that?

"[Prosecutor]: Your Honor, that is a statement allegedly made by this witness.

"[Defense counsel]: By someone else, so it's hearsay.

"[Prosecutor]: But I can ask him if he made that statement to his brother.

"THE COURT: But you got that information from what someone else said, that's hearsay. It's not like it's a recording or something written down, it's somebody else's statement so objection is sustained, *you cannot consider hearsay*." (Emphases added.)

8

Again, it appears the prosecutor intended to impeach Powell on two disputed facts. The first disputed fact seems to be that Powell's phone was functional so he could have disengaged and called his brother, rather than reengaging with Perdue. The second disputed fact appears to be that Powell did go to the car and retrieve a gun before shooting Perdue. The State argues that the objection was improperly sustained because Powell's own statements are not hearsay.

The prosecutor knew that Powell's brother would not testify and still asked the question. This is after the first sustained objection to testimony about a phone call and another unavailable witness. This displays an inference that the prosecutor lacked good faith to cross-examine Powell about the statements and thus erred by asking the question.

*Any errors were harmless.*

Once a reviewing court determines error occurred, the burden of showing that there was no reasonable possibility that the error contributed to the jury's verdict is borne by the party benefitting from any errors. *Chandler*, 307 Kan. at 679. Therefore, the State must show that there was no reasonable possibility that the question about Powell's phone call to his girlfriend, which was witnessed by Zanders' mother, contributed to the jury's verdict. That burden is met because the record reveals three ways that the trial court likely prevented any prejudice to the outcome of Powell's trial—sustaining both hearsay objections, contemporaneous admonishments to the jury, and an instruction to the jury to not consider testimony not admitted into evidence before deliberation.

The trial court admonished the jury twice during Powell's testimony that the jury must not consider hearsay. The first admonishment occurred during Powell's direct examination, in which Powell referenced a call to his brother after the shooting. The trial court sustained the State's hearsay objection, and told the jury, "You can't testify to what

9

someone else said unless they're here, so objection is sustained. *You can't consider hearsay*." (Emphasis added.)

The second admonishment occurred during the cross-examination of Powell. After Powell's hearsay objection, the trial court told the jury, "[I]t's somebody else's statement so the objection is sustained, *you cannot consider hearsay*." (Emphasis added.) These admonishments, contemporaneously occurring with the challenged statements, likely purged any possible prejudice to the verdict by inadmissible hearsay.

Possible prejudice was also prevented by the trial court's instruction to the jury to not rely on testimony that was not admitted into evidence and that "statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by the evidence, they should be disregarded."

The trial court's sustaining of Powell's objections to the two challenged hearsay statements and the trial court's contemporaneous jury admonishment to not consider hearsay prevented any possibility of prejudice. Additionally, if there was any remaining possibility that the jury might consider the statements, the trial court's jury instruction to not consider testimony that was not admitted into evidence purged any remaining possibility of prejudice. Therefore, any possible prejudice produced by the prosecutor's erroneous questions were prevented from contributing to jury's verdict. Because any errors were harmless, we will not reverse.

*We turn to Powell's first jury instruction error claim.*

Powell next claims that the trial court's failure to sua sponte give an instruction that the State had the burden to disprove Powell's self-defense claim beyond a doubt was

10

clearly erroneous. Because he failed to ask for this instruction to be given, he must show us that the failure was clear error.

The law on this point is well-settled. When presented with jury instruction issues, a reviewing court must first determine whether the challenging party preserved the issue for appeal. Next, to determine whether error occurred, the court considers whether the omitted instruction was factually and legally appropriate. Lastly, the court determines whether the error requires reversal. The lens which focuses the inquiry turns on whether the challenging party preserved the issue. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). With no objection to the proposed jury instruction at trial, the proper standard of review is for clear error, whose burden is borne by the party claiming error. See *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

Powell did not request the instruction at trial, so this court must review the issue for clear error. Under that standard, reversal results only if this court is firmly convinced that the "jury would have reached a different verdict had the unrequested instructions been given." *State v. Waldschmidt*, 318 Kan. 633, 646, 546 P.3d 716 (2024); see *Crosby*, 312 Kan. at 639.

*The instruction was legally appropriate.*

Powell claims that the trial court should have sua sponte given the instruction on the State's burden to disprove a defendant's affirmative defense beyond a reasonable doubt:

> "The defendant raises *describe the defense claimed* as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that the defendant is guilty. The State has the burden to disprove this defense beyond a reasonable doubt. The State's burden of proof does not shift to the defendant." PIK Crim. 4th 51.050 (2020 Supp.).

11

The trial court did instruct the jury using the correct self-defense PIK instruction. In the "Notes on Use" below the self-defense instruction, the PIK Committee recommends that "[i]f the instruction is used, PIK [Crim.] 4th 51.050, Defenses—Burden of Proof, should be given." PIK Crim. 4th 52.200 (2021 Supp.).

Because the PIK Crim. 4th 52.200 instruction for self-defense recommends the use of the burden of proof instruction to be read as well, the instruction on the State's burden of proof to disprove Powell's self-defense claim beyond a reasonable doubt would have been legally appropriate.

*The instruction was factually appropriate.*

Because Powell's theory of defense consisted entirely on his claim that he used deadly force in self-defense, an instruction on the State's burden of proof to disprove an affirmative defense beyond a reasonable doubt was factually appropriate.

*The failure to instruct the jury on the State's burden of proof to disprove Powell's self-defense claim was harmless.*

The failure to give the instruction on the State's burden of proof to disprove Powell's self-defense claim beyond a reasonable doubt was erroneous but not rising to the degree required by clear error. Powell fails to firmly convince us that there was a real possibility that the jury would have reached a different verdict had the instruction been given. Our review of the instructions that were given supports our ruling.

The trial court properly instructed the jury twice on the State's burden of proof to prove Powell committed intentional second-degree murder beyond a reasonable doubt. The first instruction on the State's burden stated:

12

"It is your duty to presume that the defendant is not guilty of the crime charged. The law requires the State to prove the defendant is guilty beyond a reasonable doubt. The burden is always on the State. The defendant is not required to prove innocence or to produce any evidence."

Then the trial court gave the jury a second instruction detailing the State's burden of proof, which read:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

Along with these instructions, the trial court instructed the jury on several lesser included crimes: second degree reckless murder; voluntary manslaughter; reckless involuntary manslaughter; and involuntary manslaughter. The elements of which required the jury to find differing mens rea that Powell exhibited when he shot Perdue. For example, voluntary manslaughter required the finding that Powell *knowingly* killed Perdue, but the killing was "done upon an unreasonable but honest belief that circumstances existed that justified deadly force in defense of a person." But reckless second-degree murder and reckless involuntary manslaughter required the jury to find Powell acted *recklessly* when he shot Perdue.

Powell claims that had the self-defense burden instruction been given, the jury likely would have returned an acquittal on the intentional murder offense. His claim is not supported by the record. Had the jury believed Powell's claim that he genuinely

13

believed deadly force was necessary to protect himself from imminent bodily harm but found that force was not reasonable, a verdict for intentional murder in the second degree would not be supported. Instead, the appropriate verdict would have been for voluntary manslaughter. By finding Powell guilty of intentional second-degree murder, the jury rejected Powell's self-defense claim.

Powell fails to convince us that the verdict would have been different.

*We turn to Powell's second jury instruction claim.*

Powell next claims the trial court clearly erred by failing to sua sponte instruct the jury on how one may commit "a lawful act in an unlawful manner" contained in the involuntary manslaughter element instruction. Powell contends that the phrase is "a term of art lacking any obvious, literal meaning." Thus, in Powell's view, without a definition, the jurors were left guessing at the meaning of how one can commit "a lawful act in an unlawful manner." Powell argues that there is a real possibility that had the jury been given such a definition, they would have convicted him of the lesser included offense of involuntary manslaughter.

As in the previous instruction issue, Powell did not request such an instruction defining how one can commit "a lawful act in an unlawful manner." Therefore, the proper standard of review is for clear error. *Holley*, 313 Kan. at. 253. First, a reviewing court determines whether the requested instruction was legally and factually appropriate. And if so appropriate, reversal is warranted only if the reviewing court is firmly convinced that there was a real possibility that the jury would have reached a different verdict had the instruction been given. *Holley*, 313 Kan. at 253.

14

*Legal and factual appropriateness are met.*

The State concedes that the requested instruction would have been legally and factually appropriate had it been requested at trial. Thus, the only analysis needed is one for clear error. Powell must firmly convince this court that there was a real possibility that the jury would have reached a different verdict had the instruction been given.

*Powell fails to firmly convince this court that there was a real possibility that the jury would have reached a different verdict had the instruction been given.*

Powell claims that the evidence at trial supported an involuntary manslaughter conviction because Powell used "excessive force during an otherwise lawful act of self-defense." He claims the lack of instruction on the definition prejudiced the outcome of the trial because had the jury been instructed on the definition, the jury would have found Powell guilty of involuntary manslaughter. Powell's argument is not supported by the record.

There is no evidence in the record that the jury was confused by the involuntary manslaughter elements or that Powell committed a lawful act in an unlawful manner. On the contrary, they likely understood the element given the explanation Powell provided in his closing argument, in addition to the jury's verdict, finding Powell guilty of intentional murder in the second degree beyond a reasonable doubt.

In his closing argument, Powell went through each lesser included offense, explaining what the jury would need to find to convict him of each offense. On the lesser included offense of involuntary manslaughter, Powell told the jury that they would need to find Powell used excessive force when shooting Perdue.

What crushes Powell's argument is that the jury found him guilty with the charged crime—intentional murder in the second degree. The jury did not need to consider the lesser included offenses. The jury also rejected all lesser included offenses, necessarily concluding that Powell did not act in self-defense, and all lesser degrees of mens rea. The jury found that Powell acted intentionally. Simply put, the jury never got that far to be concerned about lawful acts committed in an unlawful manner.

This is not clear error.

*The cumulative error doctrine does not apply.*

When considered together, cumulative trial errors may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional, the party benefiting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022).

At most there were two harmless prosecutorial errors based on the prosecutor's questions during Powell's cross-examination concerning unavailable witnesses' statements. The cumulative error rule does not apply if there are no errors or only a single error. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

Affirmed.