IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,894

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL ALAN KEYES,
*Appellant.*

SYLLABUS BY THE COURT

1.

Under K.S.A. 2019 Supp. 21-5222, "[a] person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force."

2.

In general, a defendant is legally entitled to an instruction on every affirmative defense that is supported by competent evidence. The defense theory of self-defense is an affirmative defense, and once a defendant properly asserts a self-defense affirmative defense, the State must disprove self-defense beyond a reasonable doubt.

3.

A self-defense instruction is factually appropriate if competent evidence would permit a reasonable fact-finder to conclude that the defendant sincerely and honestly believed it was necessary to kill to defend the defendant or others and that a reasonable person in the defendant's circumstances would have perceived the use of deadly force in self-defense as necessary.

1

Appeal from Grant District Court; CLINT B. PETERSON, judge. Opinion filed September 11, 2020. Reversed and remanded with directions.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Jessica E. Akers*, county attorney, argued the cause, and *Derek Schmidt,* attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: A Grant County jury convicted Michael Keyes of first-degree premeditated murder for the death of Jimmy Martin. On direct appeal, Keyes argues that the district court erred in refusing to give his requested jury instructions of self-defense and involuntary manslaughter.

Viewing the evidence in the light most favorable to Keyes, we agree that the district court erred in not instructing the jury on self-defense. And because we are not convinced that there is no reasonable probability the error affected the outcome of the trial, we must reverse and remand Keyes' case to the district court.

FACTUAL AND PROCEDURAL BACKGROUND

Martin and Keyes both lived on the same property owned by Tina Martin. Keyes—who was dating Tina—lived in a trailer on her property. Tina also allowed Martin—who was her ex-husband—to live on her property in a different trailer. In early April 2016, Martin's daughter reported Martin missing. After weeks went by without locating Martin, Carlo Malone—son of Tina—told his probation officer that he witnessed Keyes kill Martin.

2

After Malone's probation officer reported this information, the Kansas Bureau of Investigation (KBI) interviewed Malone to get more information about Martin's alleged death. During his interview, Malone told detectives that Keyes broke into Martin's trailer in the middle of the night and shot him to death. Malone admitted to helping Keyes dispose of Martin's body and eventually led officers to the burial site.

Detectives then interviewed Keyes. During Keyes' first interview, Keyes denied having anything to do with Martin's disappearance. But after detectives discovered Martin's body, Keyes admitted to shooting Martin four times: twice in the head and twice in the chest. Based on evidence gathered throughout the investigation, along with Malone's and Keyes' statements, Keyes was charged with first-degree premeditated murder.

Malone and Keyes gave conflicting narrations of Martin's death at trial. Malone—testifying for the State—told the story of a brutal murder. Malone lived in his mother's trailer along with his wife on Tina's property. Malone testified that on the day of Martin's death, Malone and his wife woke up to a fire on Tina's property in the middle of the night but went back to bed after the fire department put out the fire. Malone awoke a second time to find Keyes in his living room. Malone testified that Keyes approached him and said: "'Come on, you're going to help me with this. And if you tell anybody, then I'm going to kill you, and your family's not going to leave the farm.'" Malone said he saw that Keyes was carrying a gun and decided it was best to follow his instructions.

Malone testified that he followed Keyes to Martin's trailer, where Keyes instructed him to "'[s]tand at the back door and make sure nothing comes out.'" Keyes then went around to the front door and entered the trailer allegedly wearing night vision goggles. Malone did not hear Keyes knock but did hear Keyes' footsteps once Keyes was inside the trailer and walked past the back door. Malone then opened the back door to peek his

3

head in, but it was too dark to see anything. Malone testified he could hear an exchange between Keyes and Martin (also known as Cowboy):

"It was pitch black. I couldn't see anything. But all I heard was Cowboy says, 'Who's this?' And Michael says, 'The bogeyman.' And [Keyes] says, 'Are you going to stop harassing these women?' And Cowboy said, 'Well, do what you got to do.' And then [Keyes] shot Cowboy and all I heard was his last breath."

Malone testified that after Keyes shot Martin, Keyes told Malone to leave while he cleaned up. Later, Keyes returned to Malone's trailer instructing Malone to get into Keyes' Ford Expedition. Keyes drove Malone back to Martin's trailer, where Keyes had wrapped Martin's body. Keyes and Malone then drug the body out of the trailer and loaded it into the back of the vehicle. Keyes and Malone then drove Martin's body to a pasture on Tina's property. Once they reached the pasture, they unloaded the body and placed it under a crate.

Malone then testified that they returned to the pasture the next night to bury Martin's body. The two started to dig a hole, but Keyes stopped because it was too hard for him. So Malone dug the hole by himself. Once Malone dug a waist deep hole, Keyes and Malone placed Martin's body in the hole. They then covered the hole with dirt and Keyes pulled a wooden frame over the grave. Malone was also arrested for his involvement in Martin's murder based on his statements to detectives.

Keyes told a different story at trial. First, Keyes denied Malone's presence at Martin's trailer during the shooting and when Keyes buried the body. Keyes explained that on the night he shot Martin, a fire broke out on Tina's property. This wasn't the first fire to break out on the property, however, and Keyes started to suspect Martin set the fires because he was the "common denominator." So Tina instructed Keyes to kick

Martin off her property. Keyes planned to tell Martin to leave but took his gun with him because he believed Martin was "out of control" and dangerous.

Keyes arrived at Martin's trailer and knocked on the front door. After no response, Keyes entered the front door of the trailer, yelling out for "Cowboy." Eventually, Keyes found Martin "passed out" in his bed. Keyes shook Martin to wake him up while accusing Martin of trying to "burn us out." Keyes said Martin responded by stating "so what." Keyes then told Martin he had to leave Tina's property. Martin responded by saying "I'm not going anywhere" and threatened to kill Keyes. Keyes stated that Martin then grabbed a knife from his nightstand and got out of bed slashing the knife towards Keyes. Keyes shot Martin twice in the chest, but Martin continued to fight. So Keyes shot Martin two more times in the head.

Keyes testified that after killing Martin, he wrapped Martin's body in plastic with neckties and loaded the body into a Ford Expedition. Testimony from KBI detectives corroborated this—neckties were found strewn about Martin's bedroom and Martin's blood was found in Keyes' Ford Expedition. Keyes then stated he took Martin's body to a remote part of Tina's property and buried the body. Keyes said he did not bother to call the police because they had been unresponsive on other occasions when Keyes and others had reported Martin's erratic and violent behavior.

The jury also heard testimony from the coroner Altaf Hossain. Hossain explained that Martin had been shot four times: twice in the head and twice in the chest. Both of Martin's gun wounds to the head were in the left temporal region. According to Hossain, these gunshot wounds were fatal and Martin would not have been able to move after a bullet entered the temporal region of his brain. Hossain also explained the location of Martin's chest wounds. One bullet went through Martin's heart, while the other struck Martin's aorta and lungs.

At the close of evidence Keyes requested jury instructions on self-defense and involuntary manslaughter. Over objection by the defense, the court denied the requested instructions finding that the evidence failed to support either instruction. The final jury instructions included a first-degree premeditated murder instruction and a second-degree intentional murder instruction. After deliberating, the jury unanimously found Keyes guilty of first-degree premeditated murder. The court later sentenced Keyes to life in prison without the possibility of parole for 50 years.

ANALYSIS

Keyes now argues the district court committed reversible error when it refused to instruct the jury on self-defense and involuntary manslaughter.

> "When analyzing jury instruction issues, we follow a three-step process:
> '(1) determining whether the appellate court can or should review the issue, i.e., whether
> there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal;
> (2) considering the merits of the claim to determine whether error occurred below; and
> (3) assessing whether the error requires reversal, i.e., whether the error can be deemed
> harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

Keyes properly preserved both of the arguments here satisfying the first step of this analysis. At trial, Keyes requested jury instructions for self-defense and involuntary manslaughter and objected when the court denied both. Because Keyes properly preserved these issues for appeal, any error is reversible only if this court determines that there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *State v. Barrett*, 309 Kan. 1029, 1037, 442 P.3d 492 (2019). Determining whether there was error requires us to consider whether the instructions were legally and factually appropriate, using an unlimited standard of review of the entire record. *McLinn*, 307 Kan. at 318. In doing so, we view the evidence in the light most favorable to the defendant. *State v. Barlett*, 308 Kan. 78, 84, 418 P.3d 1253 (2018).

6

First, Keyes argues the district court erred in refusing to give an instruction on self-defense. We agree—a self-defense instruction was legally and factually appropriate based on the evidence introduced at trial. First, a self-defense instruction was legally appropriate because criminal defendants are generally entitled to an instruction on the law applicable to their theory of the case. See K.S.A. 2019 Supp. 21-5108(c). But the defendant must also show that this affirmative defense was supported by competent evidence—i.e., that it was factually appropriate. See K.S.A. 2019 Supp. 21-5108(c).

Under K.S.A. 2019 Supp. 21-5222, a person has the right to use deadly force in some cases:

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

> "(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person.

> "(c) Nothing in this section shall require a person to retreat if such person is using force to protect such person or a third person."

In short, Kansas law justifies the use of deadly force only if a person reasonably believes it is necessary to prevent imminent death or great bodily harm. *State v. Qualls*, 309 Kan. 553, 557, 439 P.3d 301 (2019).

Here, the State argues Keyes could not claim self-defense under K.S.A. 2019 Supp. 21-5222 because Keyes provoked Martin by taking a gun to his trailer and

7

threatening Martin. Indeed, K.S.A. 2019 Supp. 21-5226 lists scenarios in which use of force in self-defense cannot be justified. A defendant cannot claim a justifiable use of force when the defendant:

"(a) Is attempting to commit, committing or escaping from the commission of a forcible felony;

"(b) initially provokes the use of any force against such person or another, with intent to use such force as an excuse to inflict bodily harm upon the assailant; or

"(c) otherwise initially provokes the use of any force against such person or another, unless:

(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force; or

(2) in good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force." K.S.A. 2019 Supp. 21-5226.

The State's theory, however, ignores the evidence presented by Keyes undermining the State's case. In determining whether a self-defense instruction was factually appropriate, we must consider all the evidence admitted at trial—including Keyes' testimony. To determine whether deadly force is justifiable under K.S.A. 2019 Supp. 21-5222, this court has recognized a two-part test:

"'The first is subjective and requires a showing that [the defendant] sincerely and honestly believed it was necessary to kill to defend herself or others. The second prong is an objective standard and requires a showing that a reasonable person in [the defendant's] circumstances would have perceived the use of deadly force in self-defense as necessary.

8

[Citation omitted.]'" *Qualls*, 309 Kan. at 557 (quoting *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 [2012]).

If the evidence would have permitted a reasonable fact-finder to conclude that this test had been met, the instruction is factually appropriate and must be given. 309 Kan. at 558 (holding that a defendant is entitled to a self-defense instruction if competent evidence recites circumstances "that could allow a reasonable juror to conclude [the defendant] was entitled to defend with deadly force").

We find that Keyes' testimony—in light of the entire record—sufficed to make a self-defense instruction factually appropriate. First, Keyes' testimony, if believed by the jury, could satisfy the subjective prong of the test by showing Keyes believed it was necessary to kill Martin in order to defend himself. According to Keyes' testimony, Keyes feared for his life when Martin came at him with a knife threatening to kill him. Although the State's evidence may have rebutted this narrative, a defendant's testimony that he or she believed deadly force was necessary is enough to satisfy the subjective prong if a reasonable fact-finder would reasonably conclude the defense applies. See *State v. Haygood*, 308 Kan. 1387, 1406, 430 P.3d 11 (2018).

Keyes' testimony, if believed, could also demonstrate that a reasonable person, in the circumstances described by Keyes, would have perceived the use of deadly force in self-defense as necessary. See *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 (2012) (defining the objective prong of the self-defense test). Based on Malone's testimony, the State argues a self-defense instruction was unwarranted because Keyes had intended to start an altercation with Martin. According to the State, Keyes took a gun, set up Malone at the back entry of Martin's trailer, and entered Martin's trailer in the middle of the night to shoot Martin four times. But again, the jury heard countervailing evidence. For example, Malone admitted that he did not witness the altercation between Keyes and Martin because he stayed outside the trailer and it was too dark to see inside. And while

9

all other evidence—including Martin's autopsy—concluded that Keyes shot Martin four times, Malone told detectives he only heard one shot.

Furthermore, Keyes claimed he was in the trailer at the property owner's request to ask Martin to leave. Keyes said Malone was not there. According to Keyes, Martin was a violent individual who was dangerous and out of control. At trial, Keyes presented evidence through several witnesses to support this. Several acquaintances of Martin testified that on prior occasions, Martin had threatened their lives with a knife. This explained Keyes' belief he needed to bring a gun to talk to Martin.

Indeed, these competing narratives highlight "why the existence of competent evidence makes the decision on the affirmative defense of self-defense a function for the jury." *Haygood*, 308 Kan. at 1407. If the jury had believed Keyes' account of what happened, the evidence considered as a whole would have permitted a reasonable fact-finder to conclude Keyes acted in self-defense. We find that a self-defense jury instruction was factually appropriate in Keyes' case and it was error not to give the instruction. Now we must determine whether the State has convinced us this error was harmless. See *Barrett*, 309 Kan. at 1039 ("for a jury instruction challenge, the touchstone of reversibility is the applicable harmlessness test"). In other words, the State must show there is no reasonable probability the error affected the trial's outcome in light of the entire record. 309 Kan. at 1037.

The State argues the district court's failure to give a self-defense instruction was harmless because Keyes' testimony was implausible. The State claims that Dr. Hossain's testimony established that Martin would have died instantaneously from the gunshot wounds to his head and would not have been capable of threatening Keyes with a knife. But Dr. Hossain did not opine as to which shots came first—head or chest—and Keyes testified that he first shot Martin in the chest. Then, after Martin continued to come at Keyes with a knife, Keyes shot him in the head.

Thus, whether Keyes used self-defense that night boils down to a credibility question. Without the jury making this credibility determination, we cannot be sure that the court's failure to instruct the jury on self-defense did not affect the outcome of this trial. Thus, we find this error reversible.

Because we find reversible error on the self-defense instruction, we need not reach Keyes' further claims of error. To do so would be to render an advisory opinion. *State v. Cheever*, 306 Kan. 760, 786, 402 P.3d 1126 (2017) ("Because the Kansas Constitution's framework 'limit[s] the judicial power to actual cases and controversies,' Kansas courts do not have the power to give advisory opinions."), *abrogated on other grounds by State v. Boothby*, 310 Kan. 619, 448 P.3d 416 (2019).

Reversed and remanded with directions.

HENRY W. GREEN, JR., J., assigned.[1]

STEVE LEBEN, J., assigned.[2]

* * *

---

[1]**REPORTER'S NOTE:** Judge Green, of the Kansas Court of Appeals, was appointed to hear case No. 118,894 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Justice Lee A. Johnson.

[2]**REPORTER'S NOTE:** Judge Leben, of the Kansas Court of Appeals, was appointed to hear case No. 118,894 under the authority vested in the Supreme Court by K.S.A. 2019 Supp. 20-3002(c) to fill the vacancy on the court by the retirement of Chief Justice Lawton R. Nuss.

LEBEN, J., concurring: While I join the court's opinion in full, I want to add a brief comment about one aspect of the standard of review we apply in a case like this. The main issue in the appeal concerns the trial court's decision not to give a jury instruction requested by the defense that went to the heart of the defendant's case.

A criminal defendant has a constitutional right to present the defense the defendant wants to pursue. *State v. Green*, 311 Kan. ___, ___ P.3d ___, 2020 WL 4913281, at *18 (2020); *State v. Roeder*, 300 Kan. 901, 927, 336 P.3d 831 (2014); *State v. Redick*, 307 Kan. 797, 805, 414 P.3d 1207 (2018). While that right isn't absolute, *Roeder*, 300 Kan. at 927, it is nonetheless a right based in the constitution.

Michael Keyes' defense theory was self-defense, and that defense could only realistically affect the trial's outcome if the trial court gave the jury guidance about it in the jury instructions. When a defense-requested jury instruction at the heart of the defendant's case is denied, that effectively shuts off the defense—and that would seem to be a denial of the defendant's constitutional right. As one federal appellate court put it, "[T]he right to present a defense would be meaningless were a trial court completely free to ignore that defense when giving instructions." *Taylor v. Withrow*, 288 F.3d 846, 852 (6th Cir. 2002); accord *Bradley v. Duncan*, 315 F.3d 1091, 1099 (9th Cir. 2002).

That it's a constitutional right at issue becomes important when we determine whether a trial-court error was harmless. Normally, this court has applied the nonconstitutional harmless-error test to cases involving claims of jury-instruction error, meaning that the State needs to show that there's no reasonable probability that the error affected the trial's outcome. E.g., *State v. James*, 309 Kan. 1280, 1301-02, 443 P.3d 1063 (2019); *State v. Macomber*, 309 Kan. 907, 921-23, 441 P.3d 479 (2019). But if we were to apply the constitutional harmless-error test, the State would have to meet a higher standard—showing beyond a reasonable doubt that the error didn't affect the trial's outcome. *Redick*, 307 Kan. at 805.

At least one state supreme court has applied the constitutional harmless-error test in cases like this one, in which the trial court had refused to give a jury instruction central to the defense case. See *Alexander v. State*, 749 So. 2d 1031, 1038 (Miss. 1999). And several federal courts have indicated that the failure to give a jury instruction central to the defense case violates the defendant's constitutional right to present a defense, although a different harmless-error standard applied in these federal cases since they arose under the federal Antiterrorism and Effective Death Penalty Act of 1996. See *Lannert v. Jones*, 321 F.3d 747, 754 (8th Cir. 2003); *Bradley*, 315 F.3d at 1098-99; *Davis v. Strack*, 270 F.3d 111, 123-24 (2d Cir. 2001); *Baker v. Yukins*, 199 F.3d 867, 875-76 (6th Cir. 1999). I'm inclined to think that because the defendant's constitutional rights are at issue in a case like ours, the constitutional harmless-error test should apply.

Even so, we need not decide which standard should apply to decide this appeal—under either one, the State has not shown the error was harmless here. Because the parties to this case haven't briefed the issue of which harmless-error standard should apply, the question would best be addressed in a future case.