NOT DESIGNATED FOR PUBLICATION

No. 126,132

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAQUAN DEAN,
*Appellant*.

MEMORANDUM OPINION

Appeal from Reno District Court; TRISH ROSE, judge. Submitted without oral argument. Opinion filed December 6, 2024. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, for appellant.

*Andrew R. Davidson*, deputy district attorney, *Thomas Stanton*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and HILL, JJ.

PER CURIAM: Daquan Dean appeals from his convictions for three counts of battery of a law enforcement officer, in violation of K.S.A. 21-5413(c)(3)(A). Dean contends that the district court erred by giving an incomplete jury instruction on the defense of involuntary intoxication. Also, Dean argues that because constitutional protection of a speedy trial attached when he became an accused, the State violated his due process rights by taking well over seven years to bring him to trial. Because the district court did not err in instructing the jury and because Dean caused the bulk of the delay for his trial, we affirm his convictions.

1

FACTS

On July 1, 2015, Dean was in the infirmary at Hutchinson Correctional Facility (HCF). Registered nurse Jerry Schmidt was assigned to work in the infirmary. Schmidt testified that Dean was not in good health and had been under observation for possible psychotic behavior and self-harm for two days. Schmidt stated that Dean was subdued when he saw Dean. Dr. Larry Bumguardner, D.O., the medical director at HCF, testified that Dean showed up at the infirmary catatonic, not talking or responding to verbal commands. Bumguardner also stated that he believed that Dean was under the influence of a synthetic cannabinoid called K-2 and the appropriate treatment was to let the drug pass through his system.

During Schmidt's shift, he observed Dean once every half hour. At approximately 8:30 p.m., Schmidt saw that Dean was unresponsive. Schmidt tried speaking to Dean through a food service port in the door and through the intercom, but Dean did not respond. Dean had stripped naked and wrapped himself in a thin mattress.

Corrections Officer Tammy Vanbuskirk testified that she had been observing Dean on her monitor all day. That day, "[h]e was just laying there like a lump on a log." But Schmidt and Vanbuskirk became concerned about Dean's well-being because he showed no movement at all. Schmidt testified that any movement would have eliminated the need to check on Dean, explaining, "If I seen [*sic*] a big toe move we would never have gone in."

But because Dean was not moving, Vanbuskirk opened the cell and they went in to make sure Dean was okay. Schmidt shook Dean and then saw Dean open one eye. Schmidt started to back up, but Dean "popped up and started swinging." Vanbuskirk tried to stop Dean with pepper spray, to no effect.

2

Schmidt testified that Dean did not say a word to him during the attack. Schmidt tried to protect himself by blocking the blows. Dean lowered his head and rammed Schmidt against the wall. From there, they fell into the shower area of the isolation room.

While Dean was on top of Schmidt, he tried to gouge Schmidt's eyes out with his thumbs. Schmidt received scratches and gouge marks to his eyes. Schmidt tried to defend himself by reaching for Dean's eyes, which caused Dean to holler at him. Dean apparently was shouting something to the effect of "they're trying to kill me." Bumguardner heard the commotion and went to the isolation room to try to help Schmidt. While Dean had Schmidt pinned, Dean bit Schmidt on the cheek and would not let go until security pulled him off.

The bite to Schmidt's face caused lacerations requiring stitches and dura bond to repair the injuries. Because it was a human bite wound, Schmidt needed a round of antibiotics and antiviral medications. An ambulance took Schmidt to the hospital, where medical staff were able to save both of Schmidt's eyes. Schmidt had scars from this attack or, in his words, "[m]y modeling career was over." Schmidt typically wore contact lenses "religiously," but he could not wear them for three months while his eyes healed.

On May 31, 2017, the State charged Dean with three counts of battery of a law enforcement officer, listing the victims as Schmidt, Vanbuskirk, and Bumguardner. The State tried to transport Dean to court on September 13, 2017, but he could not travel due to illness. The preliminary hearing was on April 2, 2018, and Dean was arraigned on May 11, 2018. The district court ordered a pretrial conference for June 22, 2018.

Dean requested continuances and the district court granted his requests on September 4, 2018, October 16, 2018, February 19, 2019, April 16, 2019, May 31, 2019, and July 30, 2019. Part of this delay was because the defense wanted toxicologist Dr. Stephen Thornton to evaluate Dean. The jury trial was set for October 1, 2019, when the

State requested a continuance based on Thornton's evaluation. On the new trial date of November 15, 2019, the State dismissed the charges without prejudice because a vital witness was unavailable.

The State refiled the same charges three days later, on November 18, 2019. The State then filed a transport order to bring Dean to court for a first appearance, scheduled for February 25, 2020. Then the district court scheduled a preliminary hearing for May 11, 2020. But this preliminary hearing did not occur as scheduled. In response to the COVID-19 pandemic, the Kansas Supreme Court entered Kansas Supreme Court Administrative Order 2020-PR-016, effective March 18, 2020. This order continued all jury trials in Kansas that had not yet begun and suspended all statutory deadlines and time limitations for bringing a defendant to trial until further notice. The effect was to push Dean's preliminary hearing to December 29, 2021. Dean was arraigned on January 3, 2022.

At a pretrial conference on March 25, 2022, Dean requested a continuance of trial, which was set for the following week. Dean explained that Thornton's toxicology report was the crux of the defense and Thornton was unavailable the week of trial. The State indicated that it was prepared to try the case.

On September 13, 2022, Dean tested positive for COVID-19, and the district court granted his request for a continuance. At a pretrial hearing on October 24, 2022, Dean requested a continuance because his defense required a witness named Joseph Thin Elk who was incarcerated in South Dakota. The district court granted a continuance, and the case went to trial on January 9, 2023.

At trial, Dean asserted the affirmative defense of involuntary intoxication. Thornton testified that he teaches medical toxicology at the University of Kansas Medical Center and is board certified in addiction medicine, emergency medicine, and medical

4

toxicology. He has done studies on the effects of bath salts, which are related to amphetamines and methamphetamine with similar effects. Bath salts cause "a lot of agitation" and "violent paranoia-type of behavior," sometimes with prolonged effects which last for days.

Thornton noted that there was no toxicology report showing what was in Dean's system on July 1, 2015. But he also noted that Dean had no history of psychosis, schizophrenia, or any sort of mental health diagnosis or treatment. Thornton testified that Dean's records were consistent with drug-induced psychosis based on symptoms such as a very high heart rate, being very sweaty, fight or flight motor agitation, and violent paranoia-type behavior.

Thin Elk testified via Zoom from South Dakota State Penitentiary. In 2014, Thin Elk was transferred from South Dakota to HCF and he was at HCF in July 2015. Thin Elk was transferred back to South Dakota in 2021 to serve a life sentence. He testified that he was in the same cell house as Dean at HCF in July 2015. Thin Elk testified that "if he was in my cell house I probably did" give Dean some Hawaiian Punch which contained "[p]robably ice meth." He stated that he mixed drinks and gave them to inmates to test the potency of a drug, typically cut with bath salts, and did not tell his test subjects.

But a corrections officer testified that prison records showed Dean and Thin Elk were held in the same cell block from May 13, 2015, to May 29, 2015. By late June, they were held on separate floors and could not have had contact.

At the end of trial, the district court instructed the jury on the three charges. On Dean's affirmative defense, the district court gave the following instruction: "Intoxication involuntarily produced is a defense if it renders the defendant substantially incapable of knowing or understanding the wrongfulness of his conduct and of conforming his conduct to the requirements of law." The jury found Dean guilty as

5

charged on January 10, 2023. The district court sentenced Dean to 130 months (10 years, 10 months) in prison, followed by 24 months of postrelease supervision.

Dean timely appeals.

ANALYSIS

I. *Did the district court commit reversible error in giving the jury an incomplete instruction on involuntary intoxication?*

Dean argues that the district court committed reversible error because it did not instruct the jury on the burden of proof for involuntary intoxication. The State argues that the instructions were not clear error because the jury would not have returned a different verdict.

When analyzing jury instruction issues, appellate courts follow a three-step process: (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, in other words, whether the error can be deemed harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021); see also K.S.A. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous.").

At the second step, appellate courts consider whether the instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. *Holley*, 313 Kan. at 254. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most

favorable to the defendant or the requesting party, that would have supported the instruction. 313 Kan. at 255.

Whether a party has preserved a jury instruction issue affects the appellate court's reversibility inquiry at the third step. *Holley*, 313 Kan. at 254. When a party fails to object to a jury instruction before the district court, an appellate court reviews the instruction to determine if it was clearly erroneous. K.S.A. 22-3414(3). For a jury instruction to be clearly erroneous, the instruction must be legally or factually inappropriate and the court must be firmly convinced the jury would have reached a different verdict if the erroneous instruction had not been given. The party claiming clear error has the burden to show both error and prejudice. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021). If the challenging party preserved the issue below, an appellate court applies one of two harmless error tests. If the instructional error impacts a constitutional right, an appellate court assesses whether the error was harmless under the federal constitutional harmless error standard, i.e., whether there was no reasonable possibility that the error contributed to the verdict. When no constitutional right is impacted, an appellate court assesses whether there is no reasonable probability the error affected the trial's outcome in light of the entire record. *Holley*, 313 Kan. at 256-57.

An appellate court exercises unlimited review when the gravamen of a defendant's complaint concerns a constitutional due process challenge. *State v. Wade*, 284 Kan. 527, 534, 161 P.3d 704 (2007). But see *State v. Williams*, 295 Kan. 506, 517, 286 P.3d 195 (2012) (characterizing an issue as a constitutional claim does not advance procedural posture when instruction was not requested below).

When the parties offer a variety of competing reasons why the requested instruction was or was not factually appropriate, the appellate court moves straight to the harmlessness inquiry. Thus, the court will assume—without deciding—that when the evidence is viewed in the light most favorable to the defendant, it was sufficient for a

rational fact-finder to find for the defendant on the requested lesser included offense and proceed directly to determining whether the failure to give the instruction was harmless. *State v. Salary*, 301 Kan. 586, 598-99, 343 P.3d 1165 (2015).

When a party asserts an instruction error for the first time on appeal, the failure to give a legally and factually appropriate instruction is reversible only if the failure was clearly erroneous. *State v. Butler*, 307 Kan. 831, 845, 416 P.3d 116 (2018); see K.S.A. 22-3414(3). The "'clearly erroneous'" principle is not a standard of review, i.e., a framework for determining whether error occurred. Instead, it supplies a basis for determining if an error requires reversal of a conviction. *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014); see *Williams*, 295 Kan. at 515-16.

Appellate courts consider jury instructions as a whole, without focusing on any single instruction in isolation, to determine if they properly and fairly state the applicable law or if it is reasonable to conclude that they could have misled the jury. *State v. Buck-Schrag*, 312 Kan. 540, 553, 477 P.3d 1013 (2020).

The Kansas Supreme Court "'strongly recommend[s] the use of PIK instructions, which knowledgeable committees develop to bring accuracy, clarity, and uniformity to instructions.'" *State v. Zeiner*, 316 Kan. 346, 353, 515 P.3d 736 (2022). PIK instructions should generally be the starting point when preparing any set of jury instructions. A district court, however, may modify or add clarifications to PIK instructions if the particular facts in a given case warrant such a change. 316 Kan. at 353.

A criminal defendant is generally entitled to an instruction on the law applicable to every theory of defense that is supported by competent evidence. See K.S.A. 21-5108(c); *State v. Keyes*, 312 Kan. 103, 107-08, 472 P.3d 78 (2020). Competent evidence is defined as evidence that "could allow a rational fact finder to reasonably conclude that the defense applies." K.S.A. 21-5108(c).

Dean submitted proposed instructions to the district court, requesting an instruction on the burden of proof. His proposed instruction stated the following:

> "D[a]quan Dean raises involuntary intoxication as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met it[s] burden of proving that the defendant is guilty. The State has the burden to disprove this defense beyond a reasonable doubt. The State's burden of proof does not shift to the defendant."

The district court's instructions omitted this page but included the instruction that involuntary intoxication acted as an affirmative defense. At the end of trial, the district court held a jury instruction conference and Dean did not object to the requested instruction being absent. Thus, this court reviews the district court's instructions for clear error.

The district court gave the general instruction that the State had the burden to prove Dean guilty and Dean was not required to prove that he was not guilty. The State argues that this general instruction satisfies the district court's responsibility to instruct the jury, citing *Buck-Schrag*. Dean acknowledges *Buck-Schrag*, but nevertheless asserts that the lack of instruction lessened the State's burden of proof.

Based on the testimony presented, the involuntary intoxication jury instructions were factually and legally appropriate. Once a defendant properly asserts an affirmative defense, the State must disprove that defense beyond a reasonable doubt. *State v. Staten*, 304 Kan. 957, 965, 377 P.3d 427 (2016). "A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. . . . Once the defendant satisfies the burden of producing such evidence, the state has the burden of disproving the defense beyond a reasonable doubt." K.S.A. 21-5108(c). Through testimony from Thornton and from Thin Elk, Dean presented the jury with some evidence to support his claim that he was involuntarily intoxicated when he committed battery.

9

Although the district court instructed the jury on this affirmative defense, it should have also instructed the jury on the burden of proof for this defense because it was legally and factually appropriate to give both instructions together.

Nevertheless, the district court's failure to provide the jury instruction was not clearly erroneous. In *Buck-Schrag*, Zachary Buck-Schrag conceded the elements of first-degree felony murder but presented an affirmative defense, which was self-defense. The district court instructed the jury on the affirmative defense but neglected to instruct the jury that the State had the burden to disprove the affirmative defense. The instructions as a whole informed the jury that the State had the burden to show that Buck-Schrag was guilty beyond a reasonable doubt, to consider his affirmative defense when deciding whether the State met its burden, and that the burden of proof never shifted to Buck-Schrag. The *Buck-Schrag* court affirmed his conviction, holding that the instructions fairly and accurately stated the law and were not erroneous. 312 Kan. at 553-54. Here, the jury received the same general instructions as in *Buck-Schrag* and an instruction on Dean's affirmative defense. Dean presents no caselaw which could direct this court to arrive at a different conclusion.

Furthermore, there is no reasonable probability that the jury would have reached a different verdict absent the instructional error. The treating physician surmised that Dean was suffering the effects of a synthetic cannabinoid. Dean's toxicology expert testified about the effects of bath salts. Thin Elk testified that he gave Dean "probably ice meth." There was no toxicology report showing which drug actually was in Dean's system. The evidence never credibly established which drug intoxicated Dean.

And the jury heard evidence undermining Dean's explanation that he could have consumed any drug involuntarily. First, the story for how he was involuntarily intoxicated was not firmly established. Thin Elk testified that he "probably" gave Dean a

10

drug and it was "probably ice meth," but he clarified that he "could have gave [*sic*] him," and could not say for certain that he did.

This noncommittal testimony was not plausible. Corrections officers testified that Dean and Thin Elk were both in block A3 for only a single day in mid-May, but one was on the north side and one was on the south side. On June 25, 2015, they were in separate buildings. And on June 29, 2015, within days of the July 1 incident, they were in the same building but on separate floors with no interior connection providing access and no open movement allowed for inmates. This evidence made it unlikely that the jury would credit Thin Elk's ability to drug Dean. But also, it undermines Thin Elk's reason for doing so, which he explained was to test potency. If he wanted to observe a drug's potency, it would be implausible for him to give drugs to an inmate in a different cell block who he could not observe. Because the jury's verdict would have been the same absent the instruction error, we affirm Dean's convictions.

II. *Did the State violate Dean's rights by taking over seven years to bring Dean to trial?*

Dean argues that his due process rights were violated because it took over seven years for the State to bring him to trial. The State argues that most of the delay came from Dean, with some additional interference from the COVID-19 global pandemic.

K.S.A. 22-3402 states, in relevant part:

> "(a) If any person charged with a crime and held in jail solely by reason thereof shall not be brought to trial within 150 days after such person's arraignment on the charge, such person shall be entitled to be discharged from further liability to be tried for the crime charged, unless the delay shall happen as a result of the application or fault of the defendant or a continuance shall be ordered by the court under subsection (e).
>     . . . .

11

"(e) For those situations not otherwise covered by subsection (a), (b) or (c), the time for trial may be extended for any of the following reasons:

. . . .

(3) there is material evidence that is unavailable, reasonable efforts have been made to procure such evidence and there are reasonable grounds to believe that such evidence can be obtained and trial commenced within the next succeeding 90 days. Not more than one continuance may be granted to the state on this ground, unless for good cause shown, where the original continuance was for less than 90 days, and the trial is commenced within 120 days from the original trial date."

The State has the obligation "to ensure that a defendant is provided a speedy trial within the statutory limits," and "[a] defendant is not required to take any affirmative action to see that his or her right to a speedy trial is observed." *State v. Vaughn*, 288 Kan. 140, 144, 200 P.3d 446 (2009); see *State v. Sievers*, 299 Kan. 305, 307-08, 323 P.3d 170 (2014). "The speedy trial clock is triggered at arraignment," including waiver of arraignment. 299 Kan. at 307; see *State v. Welch*, 212 Kan. 180, 181, 509 P.2d 1125 (1973) (finding the defendant's waiver of arraignment triggered the speedy trial statute); *State v. Montgomery*, 34 Kan. App. 2d 549, 553-54, 122 P.3d 392 (2005) (holding that "when a defendant purposefully waives arraignment . . . the waiver is an effective substitute for the arraignment and there is no need for further arraignment proceedings to begin the running of the speedy-trial clock"). Generally, the days between arraignment and the next event are assessed against the State. See *State v. Thomas*, 291 Kan. 676, 694, 246 P.3d 678 (2011); *Vaughn*, 288 Kan. at 147.

"[D]elays which result from the defendant's application or fault are not counted in computing the statutory period," including delays from a continuance granted at the defendant's request. *State v. Brown*, 283 Kan. 658, 662, 157 P.3d 624 (2007); see also *State v. Adams*, 283 Kan. 365, 369, 153 P.3d 512 (2007) (holding that "a defendant waives his or her statutory right to a speedy trial by requesting or acquiescing in the granting of a continuance"). When a defendant causes a delay by requesting a

continuance, "the appropriate commencement date for computing the delay . . . [is] the date the motion for continuance was granted." *Brown*, 283 Kan. at 666.

In this case, the speedy trial clock began to run on January 3, 2022, when Dean waived formal arraignment. The days counted against the State until Dean requested a continuance on March 25, 2022. Dean offers no argument that the State violated his statutory or constitutional rights to a speedy trial between his January 2022 arraignment and his January 2023 trial. Also, "this court has viewed the filing of the same criminal charges against the same defendant in successive cases as a single action for purposes of computing speedy trial times under K.S.A. 22-3402." *State v. Parry*, 305 Kan. 1189, 1197, 390 P.3d 879 (2017). But Dean fails to brief any argument that the dismissed charges and the refiled charges combine to violate his speedy trial rights. Issues not adequately briefed are deemed waived or abandoned. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

Instead, Dean asks us to consider a due process violation caused by the delay. He requests that this court apply the speedy trial factors from *Barker v. Wingo*, 407 U.S. 514, 530-32, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). Under *Barker*, this court would balance the following factors:  (1) length of the delay; (2) reason for the delay; (3) defendant's assertion of his or her rights; and (4) prejudice to the defendant. 407 U.S. at 530. Dean acknowledges that the *Barker* factors are used in speedy trial analysis, but points to cases where Kansas appellate courts have adapted the factors to determine if a due process violation occurred.

But Dean falls under the general rule, while arguing that this court should analyze him as though he is an exception. Dean was held in custody awaiting trial, precisely the situation addressed by both constitutional and statutory speedy trial rights. Dean incorrectly argues for a due process analysis instead, citing four exceptions which do not apply to him. The first one is appellate delay as stated in *State v. Hurst*, 62 Kan. App. 2d

13

614, 618, 521 P.3d 1 (2022). After Allen Michael Hurst filed a notice of appeal, the process slowed from difficulties in appointing conflict-free counsel. Hurst's trial had already occurred and so he could not claim that his speedy trial right was violated by delay in his appeal. The *Hurst* court held that the *Barker* balancing test was adaptable for determining whether a delay in the appellate process violated a defendant's due process rights. 62 Kan. App. 2d at 618. Dean is not claiming that his appeals process was delayed. He claims that the State failed to bring him to trial quickly.

Dean's second exception similarly fails. He cites due process considerations in a case delayed after remand to the district court in *State v. Rodriguez*, 60 Kan. App. 2d 320, 327-28, 494 P.3d 155 (2021). But Dean's case was not on remand.

Third, Dean cites due process challenges to delays in sexually violent predator determinations in *In re Care & Treatment of Ellison*, 305 Kan. 519, 531-32, 385 P.3d 15 (2016). The Kansas Sexually Violent Predator Act (KSVPA) is a comprehensive statutory scheme for the civil commitment of persons alleged to be sexually violent predators for long-term control, care, and treatment after they have served criminal sentences. Our Supreme Court acknowledged the dividing line between civil commitment and criminal sentencing when it announced it would borrow the *Barker* factors from speedy trial analysis and apply them to due process considerations for potential sexually violent predators. "The multifactor test used in *Barker* . . . to assess constitutional speedy trial rights in criminal cases provides the appropriate ad hoc approach to evaluate claims of undue delay in proceedings brought under the [KSVPA]." *Ellison*, 305 Kan. 519, Syl. ¶ 2. But the State was not seeking civil commitment of Dean under the KSVPA.

And finally, Dean cites delays in probation proceedings from *State v. Curtis*, 42 Kan. App. 2d 132, 143-44, 209 P.3d 753 (2009). None of these previously mentioned exceptions apply. Dean's case was not on appeal as in *Hurst*. It was not on remand as in *Rodriguez*. The case did not fall under the KSVPA as in *Ellison*. And Dean was not on

14

probation as in *Curtis*. Dean fails to explain why this court should apply due process considerations to what is clearly a speedy trial claim. He provides no citation to any case where a Kansas appellate court has accepted this reframing. Failure to support a point with pertinent authority or failure to show why a point is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue. *State v. Meggerson*, 312 Kan. 238, 246, 474 P.3d 761 (2020).

In short, Dean has encased his speedy trial contentions within a due process argument. Nevertheless, in K.S.A. 22-3402, our Legislature has gone to the trouble of defining what constitutes a speedy trial. To find acceptance with Dean's due process argument, this would soon eclipse the meaning of the speedy trial statute (K.S.A. 22-3402) if Dean is allowed to obscure the meaning between the speedy trial statute and his due process argument to vacate his convictions. Dean repeats the same blurring of the lines between speedy trial and due process that he raised with the district court. He used the phrase "due process" to introduce and conclude his motion to dismiss, but the argument presented in the motion is a speedy trial argument.

Dean uses this ambiguity in raising the issue before the district court to his advantage. He shifts his weight from speedy trial arguments, which he largely abandons, to lean heavily on due process considerations resulting from a delayed trial. But this shift in argument works against him, rather than in his favor. Because he shifts away from a speedy trial argument, he fails to brief any reason for this court to find that his speedy trial rights were violated. Instead, he shifts into an argument that Kansas appellate courts have used exceptions to take the speedy trial factors from *Barker* and apply them to due process considerations. Yet he fails to brief why we should use that framework in his case when he does not fall into one of those previously discussed exceptions. Issues not adequately briefed are deemed waived or abandoned. *Gallegos*, 313 Kan. at 277.

15

There are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including the following: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the district court was right for the wrong reason. *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021). Supreme Court Rule 6.02(a)(5) (2024 Kan. S. Ct. R. at 36) requires an appellant to explain why an issue that was not raised below should be considered for the first time on appeal. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). In *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014), and *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015), the Kansas Supreme Court warned that Supreme Court Rule 6.02(a)(5) would be strictly enforced, and litigants who failed to comply risked a ruling that the issue was improperly briefed and would be deemed waived or abandoned. See *State v. Holley*, 315 Kan. 512, 524, 509 P.3d 542 (2022). Here, Dean's issue is improperly briefed, particularly because he fails to show why we should reframe his speedy trial argument as though he fell under a new legal theory exception.

On the other hand, for the sake of argument, if we assume that Dean could properly invoke his due process argument, we conclude that it would fail under the four *Barker* factors. Although Dean's argument ultimately fails, it is not entirely without merit. His argument has some intuitive appeal. He points to the total time between the incident on July 1, 2015, and trial on January 9, 2023. He also notes that the State—without explanation—waited nearly a full two years to bring charges on an incident which was captured on video in a prison with accessible local witnesses/victims. Before sentencing, Schmidt wrote a victim impact statement describing the damage he suffered to his eyes and face. He added: "One of the most traumatic aspects of this experience has been the almost 8 years it has taken for this case to get to trial." Schmidt attributed the delay primarily to Dean's "obvious posturing by the laughable repetition of continuance after continuance" and failure to take responsibility for his own actions. But the State had

surveillance video and witnesses on hand, with a victim who desired a speedy resolution. Given these facts, the delay between the incident on July 1, 2015, and the charges filed on May 31, 2017, seems not just dilatory but also callously indifferent to the victim.

Nevertheless, Dean fails to cite a single case in which a conviction was vacated when the State filed charges within the statute of limitations. When the State dismissed and refiled charges in November 2019, the State filed the new charges within the statute of limitations. Dean cites no legal authority for his premise that this court should vacate his convictions because the State should have brought charges sooner.

We determine that the total length of delay of over seven years is concerning. Under the *Barker* factors, the total delay is a triggering mechanism. "Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530; *State v. Owens*, 310 Kan. 865, 872, 451 P.3d 467 (2019) (quoting *Barker*). Our Supreme Court has determined presumptively prejudicial delays much shorter than the one at issue here. 310 Kan. at 875 (holding that a 19-month delay between arrest and trial was presumptively prejudicial); *State v. Weaver*, 276 Kan. 504, 510-11, 78 P.3d 397 (2003) (holding that a delay of 14 months was presumptively prejudicial, adding that "[t]he tolerable delay for an ordinary crime is less than for a complex one"). Considering our Supreme Court's precedent, Dean easily clears the first hurdle. The total length of delay here—roughly seven and a half years—triggers the inquiry into the other *Barker* factors.

But some of the other factors weigh against Dean. On the next factor—the reason for delay—the State correctly argues that Dean himself is responsible for multiple continuances and further delay came from COVID-19. But the State is also not without blame. As discussed, the incident occurred July 1, 2015, and the State filed charges on May 31, 2017. The State gives no reason for waiting one year and 10 months before filing charges. And the State's explanation that a global pandemic delayed proceedings is

17

odd considering that the incident happened on July 1, 2015, and COVID-19 did not shut down Kansas courts until March 2020. The State correctly points to the record, showing that Dean's continuances explain why the case was not resolved before COVID-19 became a problem. But after the pandemic slowed proceedings, the State still was not blameless. At a hearing on a motion to dismiss, the State admitted to losing track of the case during the shutdown as follows: "And at some point the case kind of fell out of the docket. The State realized the case was floundering and attempted to set the case for a preliminary hearing as soon as we could, which was December 29[, 2021]." Despite those explanations, the reason for delay falls primarily into two categories: Dean's requested continuances and the global pandemic.

The record contains nine verifiable instances of the district court granting a continuance which Dean requested: September 4, 2018, October 16, 2018, February 19, 2019, April 16, 2019, May 31, 2019, and July 30, 2019, before the State's dismissal and March 25, 2022, April 26, 2022, and October 24, 2022, after the State refiled charges. Dean apparently could not travel to court due to illness two additional times, first in September 2017 and second in September 2022 after testing positive for COVID-19. The State also implies that Dean waited until the last minute to share Thornton's toxicology report with the State, causing the State to request a continuance on October 1, 2019. An incomplete record does not confirm that Dean delayed sharing the report, but on October 1, 2019, the district court granted the State a continuance with time charged to Dean for speedy trial purposes.

In short, the record shows considerable delay caused by or attributable to the defense. The State should have been more diligent, but Dean makes no argument that the State violated his right to speedy trial. Instead, he argues that he was denied due process because of delay. Not counting the two instances of illness against him, Dean requested nine continuances. The State received one. The record seems to show that both sides were ready for trial in 2020 but, due to COVID-19, the court was not. Dean first delayed trial

18

to enlist the aid of a toxicologist, then to track down Thin Elk to testify for the defense. The primary source of delay was Dean's efforts to secure witnesses for his defense. The second *Barker* factor—reason for delay—weighs in favor of the State.

Dean argues that the next factor—assertion of his right to a speedy trial—weighs in favor of vacating his convictions. He points to a motion to dismiss in the record and his argument at trial that the appropriate action was to dismiss the case. The State makes the fair point that Dean waited to file his motion to dismiss until September 2022, seven years after the incident. Also, the State notes Dean's nine requests for continuances and his acquiescence to the State's one requested continuance. Dean presents us with an additional difficulty. As discussed, his motion to dismiss asserted one right but argued another. His introduction and conclusion to his motion to dismiss used the phrase "due process," but the argument presented in the motion is a speedy trial argument. On appeal, he presents only a due process argument. Nevertheless, Dean moved to dismiss and thus the third factor—somewhat ambiguously—weighs in Dean's favor.

But the State prevails on the final factor—prejudice—which seems to carry the greatest weight and acts as something of a tiebreaker. See *United States v. Loud Hawk*, 474 U.S. 302, 315-17, 106 S. Ct. 648, 88 L. Ed. 2d 640 (1986) (holding that the defendant failed to establish prejudice and finding no speedy trial violation); *Barker*, 407 U.S. at 535-36 (holding that the defendant failed to show prejudice and therefore failed to establish a speedy trial violation); *Owens*, 310 Kan. at 880-81 (holding that the first and third factors favored the defendant but the second and fourth factors favored the State). When assessing prejudice for a constitutional speedy trial analysis, we consider both actual prejudice and, in a proper case, presumed prejudice flowing from excessive delay. *State v. McDonald*, 62 Kan. App. 2d 59, 70, 506 P.3d 930 (2022). "It is defendant's burden to establish actual prejudice." 62 Kan. App. 2d at 70. Presumed prejudice arises from delay attributable to the government which is long enough to presume that the defendant's trial would be compromised. 62 Kan. App. 2d at 73 (citing *Doggett v. United*

19

*States*, 505 U.S. 647, 657-58, 112 S. Ct. 2686, 120 L. Ed. 2d 520 [1992]; *United States v. Brown*, 169 F.3d 344, 351 [6th Cir. 1999]; and *United States v. Graham*, 128 F.3d 372, 376 [6th Cir. 1997]).

But the delay is not attributable to the State, which is required to apply presumed prejudice. Dean presents one instance of actual prejudice, which is that Thin Elk needed to testify remotely by video teleconference rather than in person. He argues that the jury needed to see his movements and facial expressions to judge his credibility. To support his proposition, he cites two United States Supreme Court opinions, neither of which particularly help his case.

The United States Supreme Court stressed the importance of face-to-face witness testimony in *Coy v. Iowa*, 487 U.S. 1012, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988). John Avery Coy was arrested and charged with sexually assaulting two 13-year-old girls. The trial court approved the use of a large screen placed between Coy and the witness stand while the girls testified. The United States Supreme Court expressed concern, which Dean quotes in his brief. "It is always more difficult to tell a lie about a person 'to his face' than 'behind his back.' In the former context, even if the lie is told, it will often be told less convincingly." 487 U.S. at 1019. But in *Coy*, the witnesses were testifying against the defendant and their testimony, even if untruthful, could result in his conviction. Here, Thin Elk testified for Dean, not against him. The *Coy* Court's concern that a witness might lie if not confronted face to face works against Dean rather than in his favor.

Furthermore, the *Coy* Court did not have a final say in the matter. Dean's second citation undermines the first because the United States Supreme Court revisited issues related to child sexual assault victims in *Maryland v. Craig*, 497 U.S. 836, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990). Dean cites *Craig* for the proposition that in-person testimony enhances the fairness of criminal proceedings. "[F]ace-to-face confrontation

20

enhances the accuracy of factfinding by reducing the risk that a witness will wrongfully implicate an innocent person." 497 U.S. at 846. But the *Craig* Court stated this explanation on its way to approving of the use of one-way closed-circuit television testimony in child abuse cases. 497 U.S. at 857. Dean argues against remote testimony with a citation to a case which affirmed remote testimony.

In the end, remote testimony was not the factor which damaged Thin Elk's testimony. He testified that he secretly drugged Dean to test the drug's potency at a time when he could not have accessed Dean to either drug him or observe the results. Thin Elk's incredible story would not have been more credible if the State had brought Dean to trial early enough that Thin Elk could be personally present.

Thus, Dean fails to establish actual prejudice, making this case parallel to *Owens*. Ken'Dum Dan'Sha Owens appealed his convictions for aggravated robbery, criminal use of a weapon, and criminal deprivation of property related to his carjacking of Nathan Davis. Owens argued that the delay was prejudicial to his defense because Davis' faded memory covered up details related to the identification, leaving Davis' early identification of Owens to police as virtually unchallengeable. But Owens successfully punched holes in Davis' identification. The record showed that the delay did not impair Owens' defense and Owens failed to show prejudice. Here, Dean presented the testimony he sought from Thin Elk and the passage of time had no bearing on the testimony. Rather, the implausible nature of Thin Elk's testimony and the State's witnesses presenting prison records would have undermined Dean's defense whenever he went to trial. The delay had no bearing on the weakness of Dean's involuntary intoxication defense.

Alternatively, Dean's appeal fails because the State presents this court with the criteria which was absent in *McDonald*. The State took eight years to arrest Cass Wayne McDonald on charges of rape of a child under the age of 14 years. The *McDonald* court found that McDonald failed to show actual prejudice, but the *McDonald* court presumed

21

prejudice. The State failed to mitigate presumed prejudice by showing acquiescence or rebuttal.

> "When, as here, a defendant relies on a presumption of prejudice to establish the fourth *Barker* factor and identifies a delay of sufficient duration to be considered presumptively prejudicial, 'this presumption of prejudice can be mitigated by a showing that the defendant acquiesced in the delay, or can be rebutted if the Government "affirmatively prove[s] that the delay left [the defendant's] ability to defend himself unimpaired."'" 62 Kan. App. 2d at 73-74 (quoting *United States v. Battis*, 589 F.3d 673, 682 [3d Cir. 2009]).

The *McDonald* court found that nothing showed that McDonald acquiesced and that the State failed to offer affirmative proof that McDonald's defense was unimpaired. Thus, the presumptive prejudice from excessive delay stood unrebutted and the *McDonald* court held that McDonald's speedy trial rights were violated. 62 Kan. App. 2d at 74.

But the record here shows Dean's acquiescence in delay because of his own repeated requests for further delay. Dean sought 9 continuances—11, if this court counts the 2 times he was ill. And though Dean piled up those continuances to seek witnesses in his defense, the State rebuts the presumption of prejudice by showing that Dean presented his defense unimpaired by delay. Rather than lose track of witnesses, Dean found them. And the weakness of their testimony was not due to delay. For example, toxicologist Dr. Thornton had to acknowledge that there was no toxicology report showing what Dean had in his system when the incident occurred, which would have been true whenever the case went to trial. And Thin Elk's testimony conflicted with prison records showing that he had not been near Dean, which also would have been true regardless of delay. Although the State was unable to rebut the presumption of prejudice in *McDonald*, it adequately rebuts the presumption here.

We decline to apply the speedy trial factors from *Barker* to Dean's due process claim. But if we do, then Dean fails to show that he was prejudiced by the State's delay. Dean's own continuances caused the bulk of the delay, even though the State is not entirely blameless. Ultimately, Dean does not show that any delay prejudiced his defense. Clutched by these very facts, Dean has failed to present either a sufficiently briefed speedy trial claim or a sufficiently briefed due process claim. So, we affirm his convictions.

Affirmed.